# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **CHRISTY GRIFFITH**, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**CONTEXTMEDIA HEALTH, LLC d/b/a OUTCOME HEALTH**,<br><br>Defendant. | Civil Case No.: 16-2900<br><br>District Judge: Hon. Elaine S. Bucklo<br>Magistrate Judge: Hon. Mary M. Rowland |

**Plaintiff's Reply Brief in Support of Plaintiff's Motion for Class Certification Pursuant to Fed. R. Civ. P. 23(b)(3).**

**INTRODUCTION**

On September 29, 2017, Defendant ContextMedia Health, LLC ("Defendant") filed its opposition to Plaintiff's Motion for Class Certification. (Dkt. 76.) Defendant focuses on ascertainability, superiority, and predominance.

With respect to ascertainability, Defendant makes two arguments. First, Defendant argues that Plaintiff has failed to propose a method through which class members can be identified. But Plaintiff has actually proposed two methods (and herein suggests a third). Second, Defendant argues that the class definition contained in the complaint is the operative class definition (rather than the slightly modified class definition in Plaintiff's motion), and that this definition is fail-safe. The question of whether a plaintiff is to be held to the definition of the class contained in the complaint is an open question in the Seventh Circuit, but even those courts that hold a plaintiff to the complaint's definition freely grant leave to amend the complaint and modify the definition at the same time as, or shortly after, the motion for class certification. Here, Plaintiff has contemporaneously filed a Motion for Leave to Amend the complaint to update the complaint's class definition to the definition in Plaintiff's Motion. If the Court grants this Motion, Defendant's argument is moot. In any event, neither the operative complaint's definition nor the definition proposed in Plaintiff's motion are fail-safe.

Next, Defendant's argues that a class action is not superior because some class members' claims are potentially large, and are thus not meant to be aggregated. But nothing in Rule 23 or case law precludes aggregating claims when some of the aggregated claims might be large. Further, while damages for some class members could be significant, most class members stand to gain nothing – or even stand to lose money – if they bring their claims individually. Nothing suggests that individual trials of each class member's claim is a more efficient use of judicial resources than a class action.

Finally, Defendant argues that individualized issues predominate because there is no way to know whether texts sent to putative class members were actually received. But receipt is not relevant to the TCPA. The TCPA deems it a violation to "make any call . . . using any automatic telephone dialing system." This interpretation has been unanimously upheld by courts. Even if it were relevant, however, if a class member (like all class members in the proposed class here) responded "stop" or "stop CMH tips" to a text, that definitively indicates that the class member *was actually receiving* texts from Defendant.

## DISCUSSION

### A. Ascertainability

#### i. Plaintiff Proposed Two Methods to Ascertain the Identity of Class Members, and Now Proposed a Third.

In her Motion for Class Certification, Plaintiff Griffith proposed two methods for ascertaining the identity of class members. The first method would be to use a class action administration firm, such as ILYM Group or KCC,[1] with experience ascertaining the identity of class members from nothing more than a telephone number. In a declaration, Lisa Mullins of ILYM group claims that her company would be able to identify 85%-90% of class members through available databases and third parties that specialize in such tasks. While Defendant argues that this declaration should not be considered, this issue was separately briefed (Dkt. 79) and need not be discussed at length here.

Plaintiff also proposed enlisting the help of carriers, voluntarily or via subpoena. All major carriers – specifically, Verizon, AT&T, Sprint, and T-Mobile, which serve approximately 95

---

[1] While Lisa Mullins of ILYM has submitted a declaration, other class action firms may certainly be able to handle this same task. For example, Plaintiff's counsel knows from previous work with KCC that KCC can ascertain the identity of class members from telephone numbers alone with a high degree of accuracy.

percent of the wireless subscribers in the United States[2] – maintain historical subscriber information that goes back far enough to cover the proposed class period. Historical subscriber information would generally include the name and address of the subscriber to a telephone number at a given point in time. According to a 2011 FOIA request by the ACLU, Verizon maintains subscriber information for three to five years; T-Mobile does so for five years; AT&T depends on length of service; and Sprint, Nextel, and Virgin retain information for an unlimited duration.[3] More recently, according to a declaration submitted in 2014 in connection with *Birchmeier v. Caribbean Cruise Line, Inc.* matter, companies still maintained such data as of 2014, though some of their policies differed slightly from those found in the ACLU's subpoena. 302 F.R.D. 240, 247-48 (N.D. Ill. 2014) (Case No. 12-cv-04069, Dkt. 235-1). According to the *Birchmeier* declaration,[4] the following information reflects the retention policy of the major carriers as of 2014:

- Verizon Wireless: Verizon can provide basic subscriber information, including information for disconnected subscribers, going back seven years.
- AT&T: Retains historical subscriber information for seven years on its customers.
- Sprint: Retains historical information for current and disconnected subscribers.

(*Birchmeier*, Dkt. 235-1, ¶ 20.) The proposed class period, which begins in July 2015, falls within all of these time periods. Accordingly, the names and addresses of all persons subscribing to the telephone numbers to which Defendant sent post-revocation text messages can be found through a subpoena to each of the carriers along the lines of:

---

[2] Compare the numbers at http://www.fiercewireless.com/wireless/how-verizon-at-t-t-mobile-sprint-and-more-stacked-up-q4-2016-top-7-carriers with the numbers at https://www.ctia.org/industry-data/ctia-annual-wireless-industry-survey, both last accessed October 3, 2017.
[3] https://www.aclu.org/cell-phone-location-tracking-request-response-cell-phone-company-data-retention-chart, last accessed October 4, 2017.
[4] Updated Information for T-Mobile was not available in the declaration. However, in another case, T-Mobile was able to provide historical subscriber information upon request. *See Johnson v. Yahoo! Inc.*, Case No. 14-cv-2028, Dkt. 139-3.

3

> During the time period of July 28, 2015 to March 31, 2016 ("Time Period"), for each of the telephone numbers included in the attached list, please identify 1) the dates, if any, each telephone number was one of [carrier's] telephone numbers and, for telephone numbers that were [carrier] telephone numbers at any time during the Time Period, 2) the name and address(es) of the subscriber(s) to those telephone numbers during the Time Period.

Such a subpoena by itself would be sufficient to ascertain the identities of most, if not all, class members and their addresses, and would alone be sufficient for ascertainability.

The use of these two methods has previously been approved for much larger classes. For example, in *Birchmeier*, the court found a 900,000-plus member class with a one-year class period ascertainable where reverse lookups and obtaining contact information from carriers were the proposed methods of ascertaining the class. 302 F.R.D. at 255; *see also Kristensen v. Credit Payment Services*, 12 F. Supp. 3d 1292, 1303 (D. Nev. 2014) (finding text message class to be ascertainable where "data from T-Mobile calling lists can be used to identify the individual class members."); *Booth v. Appstack, Inc.*, Case No. 13-cv-1533, 2015 U.S. Dist. LEXIS 40779, *9 (W.D. Wash. Mar. 30, 2015) (finding a class to be ascertainable where the plaintiffs "intend to rely on additional records, such as telephone carrier records and reverse look up directories, to identify class members and establish elements of their claims."). Here, we have a class of approximately 2,200 persons with a 10-month class period. If these proposed methods are acceptable for a class 400 times the size of this class and a longer class period, they are acceptable here.

The parties could also enlist the help of a class action administrator to manually dial each telephone number on the list and ask certain questions to ascertain whether the owner of that number is a class member and to ascertain that person's identity. While this is not feasible with a class of 900,000-plus, it could conceivably be done in short order for a class of 2,239. This method could also be used as a form of notice – if certain class members' identities remained a mystery

4

after the efforts outlined above, notice can still be provided to those class members through a manually dialed, live phone call, utilizing a script containing certain pertinent notice information.

Ultimately, while ascertaining the identities of persons known only by their phone numbers is necessarily going to be more involved than ascertaining the identities of class members whose identities are already known to a defendant (for example, customers), *simplicity* is not the standard. The class need only be ascertain*able*, and that it might be more difficult in one case to ascertain the identities of some class members than it would be in another case does not matter, so long as it is possible to do so. *Birchmeier*, 302 F.R.D. at 245, 248. Subpoenas to the major wireless carriers would in and of itself ascertain the identities of most, if not all, class members. When used in conjunction with a class action administration company, as Ms. Mullins outlined, and/or manually dialed calls, the class is clearly ascertainable.

### ii. The Class Definition Proposed in Plaintiff's Motion is the Operative Definition.

Plaintiff acknowledges that the definition proposed in her Motion for Class Certification and in her complaint differ slightly. The proposed class definition in the operative Second Amended Complaint[5] is:

> Plaintiff and all persons within the United States to whose cellular telephone number Defendant ContextMedia Health, LLC sent, in the past four years, a text message, other than an opt-out confirmation text message, using an automatic telephone dialing system, after Defendant's records, or the records of any entity with whom Defendant contracted to provide text messaging services, indicate Defendant or that entity received a text message containing the word "STOP" from that cellular telephone number.

The proposed class definition in Plaintiff's Motion for Class Certification is:

---

[5] By agreement with Defendant, the Second Amended Complaint was intended to be used only to change the name of the Defendant to reflect the proper entity.

5

> Plaintiff and all persons within the United States to whose cellular telephone number Defendant ContextMedia Health, LLC sent, between July 28, 2015 and March 31, 2016, a text message, other than an opt-out confirmation text message, as part of its "Healthy Tips" campaign, after Defendant's records or the records of any entity with whom Defendant contracted to provide text messaging services, indicate that the telephone number to which the text messages were sent had previously sent a text message with the single word "STOP" or the single phrase "STOP CMH TIPS", regardless of capitalization.

The differences are minor. The class that Plaintiff now seeks to certify limits the text messages to the "Healthy Tips" text messages, rather than any text message. It also now proposes, based on information obtained in discovery which enabled Plaintiff to narrow the proposed class period, a specific date range for the actionable text messages rather than a general "in the past four years". Finally, it now includes, based on information learned in discovery, persons who said "STOP CMH TIPS" or "STOP", rather than just "STOP". These differences are minor. The first two narrow the class definition, and the third simply reflects what Plaintiff learned in discovery about Defendant's opt-out process. "It is difficult to see how a more specific and tailored class definition will prejudice the defendants, particularly where the Court may have been compelled, at a potentially later date, to make modifications to the class definition anyway." *Chapman v. Wagener Equities*, Case No. 09-cv-07299, 2012 U.S. Dist. LEXIS 176857, *16 (N.D. Ill. Dec. 13, 2012). Nothing about the modified definition changes any theories of the case, or impact how this case has been or will be litigated.

Not only is the modified definition not prejudicial to Defendant when considered by itself, Defendant has been on notice of the retooled class definition for months. Plaintiff explicitly told Defendant on two separate occasions that she intended to broaden the class definition to include "stop cmh tips". The first of these was via letter on April 24, in which Plaintiff stated that "Plaintiff may seek to include within the class all persons who text messaged not just 'stop', but 'stop all', 'stop cmh tips', or similar." The second was via letter on July 21, in which Plaintiff stated she

6

"now intends to certify a class on behalf of all persons who sent the text 'stop' or the phrase 'stop cmh tips' and continued to receive text messages."[6]

As Defendant properly acknowledges, it remains an open question in the Seventh Circuit whether a plaintiff can modify her class definition in a motion for class certification from what it is in the operative complaint. *See Jamison v. First Credit Servs.*, 290 F.R.D. 92, 103 (N.D. Ill. 2013) ("The Seventh Circuit has not addressed the scope of the Court's discretion to modify a class definition at the certification stage. District Courts appear to be split on whether to hold a plaintiff to the class defined in the complaint."); *Savanna Group, Inc. v. Trynex, Inc.*, Case No. 10-cv-7995, 2013 U.S. Dist. LEXIS 1277, *9-10 (N.D. Ill. 2013) (finding that considering a modified class definition on a motion for class certification to be "consistent with Rule 23, which contemplates the amendment of a class certification order prior to judgment", and writing "the Plaintiff's change of class definition will not forestall the Court's class certification inquiry.").

But here, given the minor changes to the definition and the fact Defendant was put on notice of the changes months ago, to hold Plaintiff to her complaint's definition would be to elevate form over substance, and create what amounts to "busy work" for the parties and the Court. This is so because even those courts that only consider the definition in the complaint freely grant leave to amend both the definition and the complaint. *See, e.g.*, *Heastie v. Community Bank of Greater Peoria*, 125 F.R.D. 669, 672 n.3 (N.D. Ill. 1989); *Bridgeview Health Care Ctr. Ltd. v. Clark*, 09-cv-5601, 2011 U.S. Dist. LEXIS 113609, *5-6 (N.D. Ill. 2011); *Chapman*, 2012 U.S. Dist. LEXIS 176857 at *9-16. As such, Plaintiff has contemporaneously filed a Motion for Leave to File a Third Amended Class Action Complaint, which is identical to the Second Amended Complaint except

---

[6] These letters were sent as part of discussions related to potential mediation. Plaintiff does not attach them here to preserve the spirit of open communication related to any resolution of this matter but is willing to produce them in redacted format, should the Court request them.

7

for the class definition. This was the approach taken in *Chapman*, to the approval of the court, and, should the Court deem it necessary that the complaint's definition be changed, is the most efficient manner of proceeding here.

### iii. Neither Class Definition is Fail-Safe.

Defendant has failed to articulate why it believes Plaintiff's class definitions (whether in the Second Amended Complaint or in the Motion for Class Certification) are fail-safe, other than simply proclaiming them to be so. It is not. A fail-safe class definition is one that is "defined in terms of success on the merits." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 661 (7th Cir. 2015). In other words, such classes are defined in a way that a class member either wins or, by losing, is defined out of the class and is therefore not bound by the judgment. *Id.* at 660.

This is not the case here. If a person sent to Defendant a "stop" or "stop cmh tips" text message and was sent a text other than an opt-out confirmation text after that point, that person is a Class member, though no liability determinations have been made. For example, it remains to be proven whether Defendant employed an automatic telephone dialing system, as is required for TCPA liability. It also remains to be determined if the aforementioned phrases are adequate revocation. If not, persons who sent those text messages are not "defined out" of the class – they remain in the class, are bound by that determination, and lose on any theory of liability that relies on those phrases being sufficient for revocation.

Regardless, even if the Court finds fault with the class definition as fail-safe, this does not preclude Plaintiff from moving forward with her class allegations, as this problem "can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012).

8

B. **Superiority: The Presence of Large Individual Damage Claims Does Not Preclude Certification.**

Defendant argues that the presence of large individual damages claims within the proposed class precludes certification because the class action is not superior. Defendant is incorrect for four reasons.

First, this is not the law. The fact that "relatively substantial recovery [may await] many of the [putative class members], standing alone, does not defeat superiority." *Barnes v. Air Line Pilots Ass'n*, 310 F.R.D. 551, 562 (N.D. Ill. 2015). In evaluating certification of high-damage claims, courts in the Seventh Circuit consider 1) whether a defendant would be forced to stake its company on the outcome of a single trial, or be forced to settle out of fear of bankruptcy, and 2) whether a decentralized process (multiple trials, different juries, and different legal standards) would yield information needed for an accurate evaluation (primarily in mass tort claims). *See id.* at 562 (citing cases). Another consideration includes whether test cases have shown that there is a great likelihood that a plaintiff's claims lack legal merit. *Cicilline v. Jewel Food Stores, Inc.*, 542 F. Supp. 2d 831, 840 (N.D. Ill. 2008). None of these concerns are present here. This is not a mass tort case, and there is no value to multiple trials, different juries, or different legal standards. This is a statutory damages case that will hinge primarily on whether Defendant's equipment qualifies as an automatic telephone dialing system. Multiple trials and different juries would just lead to a serious multiplication of resources and efforts with little to no benefit. Furthermore, Defendant does not face an existential threat from this litigation. It has testified that it could pay the upper limits of the liability in this case (approximately $192 million, if the Court were to award discretionary treble damages). (Exhibit E, Deposition of Brad Purdy, 125:6-19.) Finally, there have been no test cases, but nothing about this case indicates that it lacks legal merit.

Second, the claims look larger in isolation than they do when considering the realities of this type of litigation and the vigorous (and technical) defenses Defendant has raised in this matter. Courts considering the size of individual damages claims do so in comparison to the cost of litigation. *See, e.g.*, *Cicilline*, 542 F. Supp. 2d at 840 (considering the same argument raised here and writing "for most potential class members, there are no actual damages and the recovery would be 'tiny relative to the expense of litigation' on an individual basis."). Plaintiff's costs in this matter have exceeded $25,000 to date, with a majority of that being spent litigating and conducting discovery into issues that are relevant whether the case is individual or a class, such as the autodialer issue which has not yet been decided. It is a safe bet that thousands more will be spent on similar issues prior to resolution. If a hypothetical individual sought to bring an individual claim and realize the full $500 per text, that individual would have to fight these same issues and take on similar costs. Assuming this individual brought his or her case with an attorney working the standard contingency arrangement (one-third plus costs) and managed to obtain $500 per text, using that low[7] $25,000 cost number, that class member would receive nothing in his or her pocket at 75 text messages or fewer.[8] Of the 2,239 putative class members here, 1,781 were sent 75 texts or fewer. Indeed, the median number of text messages is 49. Thus, for a class member with the median number of text messages, their costs would likely exceed their possible recovery.

Considering the rare prospect of discretionary treble damages (without factoring in the additional costs that would come from proving treble damages) does little to change the equation. Using the $1,500/text number, most class members stand to recover $25,000 or less.

---

[7] For example, this ignores forthcoming costs for expert depositions, rebuttal reports, and the costs associated with a jury trial.

[8] 75 text messages times $500 per text ($37,500) minus a one-third contingency fee and the costs accrued in this case (($37,500/3)+$25,000), equals a net recovery of $0. The $25,000 costs number is likely low as well, for the reasons set forth in the preceding footnote.

Problematically, though, is that 1,773 of the 2,239 (those who were sent fewer than 75 texts) class members would stand to *lose* money if they did not get those treble damages, even if they stood to gain if damages were trebled. A hypothetical class member who was sent 50 text messages could theoretically obtain $25,000 if treble damages were awarded (after costs and fees), but that same class member stands to *lose* $8,333.33 if the more common $500 per text is awarded, and gain only $8,333.33 if the court doubled, rather than trebled, damages. No class member would rationally bring such a case, and no attorney would take such a case.[9] This is especially true because the TCPA, unlike many federal and state consumer protection statutes that provide for statutory damages, does not likewise provide for the recovery of attorneys' fees, so attorneys would not be incentivized to represent individual plaintiffs bringing claims with a maximum value in the tens of thousands of dollars.

Third, prior to this litigation, no one had sued about Defendant's text messaging program, and no one has sued since. This suggests that regardless of the potential size of their claims, putative class members are not motivated to bring individual claims (if they even know about the TCPA). In any event, if there are persons who are or could be motivated to bring an individual claim, those persons will be permitted to opt out of any certified class and pursue their own remedy.

Finally, even in an ideal world where all 2,239 putative class members have been appraised of their rights, know about the TCPA, and are motivated to act, that would be 2,239 separate lawsuits litigating the *exact same issues* that are being litigated here, but in an inefficient way that multiplies costs and taxes the resources of the parties and the judicial system, not to mention Defendant. A class action is a much preferable alternative.

C. **Commonality and Predominance**

---

[9] Cutting the attorney out of the equation, 1,501 of the 2,239 class members would risk losing money if $500 per text were awarded.

11

### i. Plaintiff's Proposed Common Questions are Sufficient.

Defendant argues that Plaintiff's "three examples" of common questions are insufficient because those questions do not lead to common answers. But these were not just examples: these are *the* questions in this litigation. Each of these questions necessarily generates answers on a class-wide basis, and answering each question in favor of the class would establish a TCPA violation. Specifically:

- Is texting "stop" or "stop cmh tips" in response to one of Defendant's text messages sufficient revocation of consent?

If the answer to this is "yes," then it has been determined on a class-wide basis that class members who texted "stop" or "stop cmh tips" revoked consent.

- Did Defendant send texts to Class members after Class members revoked consent?

If the answer to this is "yes," then is has been established on a class-wide basis that Defendant sent text messages to class members without their consent.

- Is the equipment Defendant used to send these texts an "automatic telephone dialing system"?

This question can be answered on a class-wide basis because all of the "Healthy Tips" text messages were sent using the same equipment and software. (Dkt. 61, Exhibit D, 72:3-8, 108:21-110:5.) If the answer to this is "yes," then it has been established on a class-wide basis that Defendant sent text messages using an automatic telephone dialing system to class members without consent. This establishes a TCPA violation on a class-wide basis.

### ii. It is Irrelevant Whether Class Members Actually Received the Text Messages, but Common Sense Indicates That They Did.

The TCPA and all interpreting case law are clear: it is the *making* of a call, not the receipt, that triggers liability under the TCPA. *See, e.g.*, 47 U.S.C. § 227(b)(1)(A) ("It shall be unlawful for any person within the United States . . . **to make any call** (other than a call . . . made with the

prior express consent of the called party) using any automatic telephone dialing system . . . ."); *Hinman v. M&M Rental Ctr., Inc.*, 596 F. Supp. 2d 1152, 1159 (N.D. Ill. 2009) (to require receipt would "import[] elements that neither Congress, nor the FCC, nor any soundly reasoned authority has stated are part of a TCPA claim."); *CE Design Ltd. v. CY's Crabhouse North, Inc.*, 259 F.R.D. 135, 142 (N.D. Ill. 2009) ("[227(b) of the TCPA] does not specifically require proof of receipt."); *Bridgeview Health Care Ctr., Ltd. v. Clark*, Case No. 09-cv-5601, 2013 U.S. Dist. LEXIS 37310, *8-9 (N.D. Ill. Mar. 9, 2013) (same); *Palm Beach Golf Center-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245 (11th Cir. 2015) (collecting cases)).

Even if receipt were relevant, Defendant's own unsupported hypotheticals (and common sense) suggest that class members *did receive* Defendant's text messages. Defendant argues that "[s]ome class members might not have received any messages and suffered no injury if they blocked the texts (or did not have a text messaging plan), disposed of their phones, or changed their cell phone numbers at some point." But if class members did not receive Defendant's messages or did not have a text messaging plan, then it seems nonsensical (or impossible) for those class members to have sent Defendant a "stop" or "stop cmh tips" message. Similarly, if class members, all of whom sent a "stop" or "stop cmh tips" message, were not receiving text messages (already highly implausible), it would be odd for those class members to take steps to block Defendant's texts. After all, what would they be blocking if they were not receiving texts? And as for those who changed their cell phone numbers, Defendant was still sending text messages to the phone number, and presumably its new owner, without the new owner's consent.

More importantly, Defendant cannot simply pose a series of increasingly unlikely hypothetical situations that might impact some hypothetical class members, as it does here, and use those hypothetical scenarios to defeat class certification. *See, e.g.*, *Chi. Teachers Union, Local*

*1 v. Bd. of Educ. Of Chi.*, 307 F.R.D. 475, 486 (N.D. Ill. 2015) ("Nor would it be appropriate to deny initial certification under Rule 23(b)(3) because of some amorphous and purely hypothetical possibility that individualized damages determinations might override the common questions at the heart of this action[.]") (emphasis in original); *G.M. Sign, Inc. v. Group C. Communs., Inc.*, Case No. 08-cv-4521, 2010 U.S. Dist. LEXIS 17843, *15-16 (N.D. Ill. Feb. 25, 2010) ("Although [Defendant] makes vague assertions about potential individual issues of consent, these hypothetical defenses do not overcome the predominance of common questions of law and fact among potential class members."); *Galvan v. NCO Fin. Sys.*, Case No. 11-cv-3918, 2012 U.S. Dist. LEXIS 128592, *22-23 (N.D. Ill. Sept. 11, 2012) ("[Defendant] also argues that there may be some members of the class who signed arbitration clauses or class action waivers. It has not, however, provided any evidence to support the proposition that this is an actual defense at all, let alone with regard to any significant portion of class members. Absent such evidence, [Defendant's] contention is entirely hypothetical and thus does not bear on the question of predominance.").

Simply put, Defendant has produced records showing a list of all telephone numbers which sent Defendant a "stop" or "stop CMH tips" text message, which were the two methods of opting out that Defendant provided to class members. Defendant has also produced records showing the dates and times of its outgoing text messages. If the class' "stop" and/or "stop cmh tips" messages are determined to be sufficient revocation of consent, then Defendant's act of sending a text message to one of those telephone numbers after revocation is a violation, regardless of whether or not it was received.

### iii. Only the Lead Plaintiff Needs to Show Standing.

Defendant argues that Plaintiff and class members do not have standing. But "[t]he standing inquiry for class actions pertains only to the class representative." *Bernal v. NRA Grp., LLC*, 318 F.R.D. 64, 72 (N.D. Ill. 2016) (citing *Lewert v. P.F. Chang's China Bistro, Inc.*,

14

F.3d 963, 966-69 (7th Cir. 2016); *Neale v. Volvo Cars of N. Am. LLC*, 794 F.3d 353, 367 (3d Cir. 2015)). Defendant acknowledges that the Court has already rejected Defendant's *Spokeo*-based standing argument. *Griffith v. ContextMedia, Inc.*, 235 F. Supp. 3d 1032, 1035 (N.D. Ill. 2016). As such, Plaintiff continues to rely on the arguments set forth in her opposition to Defendant's Motion to Dismiss (Dkt. 27), and the reasoning in the Court's opinion. Nothing has changed.

Furthermore, as was the case with Defendant's arguments regarding predominance, Defendant simply poses a series of hypothetical situations that might hypothetically affect some hypothetical class member, in which it might have a hypothetical argument against that hypothetical class member's standing. Such unsupported speculation is insufficient to deny class certification.

### iv. Willfulness

Defendant also argues that "[Plaintiff] individually needs to demonstrate how Outcome health's conduct was willful", but this is incorrect. Plaintiff can demonstrate Defendant's willfulness or knowledge by showing that, for example, Defendant was put on notice that its opt-out process was not working and continued to send texts anyway, or that Defendant kept subscribers in its database, regardless of their revocation, in order to inflate its engagement numbers when pitching its advertising platforms. Both of these showings can be made on a class-wide basis.

## CONCLUSION

Plaintiff respectfully requests that the Court grant Plaintiff's Motion for Class Certification in full.

Date: October 13, 2017 */s/ Jeremy M. Glapion*
Jeremy M. Glapion
**THE GLAPION LAW FIRM, LLC**
1704 Maxwell Drive
Wall, New Jersey 07719
Tel: 732.455.9737
Fax: 732.709.5150
jmg@glapionlaw.com

Kristen Law Sagafi
**TYCKO & ZAVAREEI LLP**
483 Ninth Street, Suite 200
Oakland, CA 94607
Tel: 510.254.6808
Fax: 202.973.0950
ksagafi@tzlegal.com

Andrew Silver
**TYCKO & ZAVAREEI LLP**
1828 L Street NW, Suite 1000
Washington, DC 20036
Tel: 202.973.0900
Fax: 202.973.0950
asilver@tzlegal.com