**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **CHRISTY GRIFFITH**, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br>    v.<br><br>**CONTEXTMEDIA HEALTH, LLC d/b/a OUTCOME HEALTH**<br><br>                    Defendant. | Case No.: 1:16-cv-02900<br><br>Honorable Elaine E. Bucklo |

**PLAINTIFF'S UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND MEMORANDUM**

# TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................... 1

II.  BACKGROUND ............................................................................................ 1

    A.  Plaintiff's Allegations ........................................................................... 1

    B.  Procedural History ................................................................................ 2

    C.  Discovery and Motion Practice ............................................................ 2

    D.  Mediation .............................................................................................. 3

    E.  Defendant's Business Situation ............................................................ 3

    F.  The Settlement ...................................................................................... 4

        1.  Defined Class ................................................................................. 4

        2.  Monetary Relief ............................................................................. 5

        3.  Redistribution and Cy Pres ........................................................... 5

        4.  Prospective Relief .......................................................................... 6

        5.  Release ........................................................................................... 6

        6.  Service Award ................................................................................ 7

        7.  Attorneys' Fees and Costs ............................................................ 7

        8.  Administration and Notice ............................................................ 7

III.  DISCUSSION ............................................................................................... 9

A.  Legal Standard for Approval ................................................................9

B.  The Settlement is the Product of Arm's Length Negotiations. .........10

C.  The Settlement is Well Within the "Range of Reasonableness."......10

    1.  The Settlement Provides Substantial Relief in Light of the Risks of Continued Litigation. ................................................................................10

    2.  Continued Litigation is Not in the Best Interests of Plaintiff or Members of the Class. ...................................................................................13

    3.  Opposition to the Settlement. ........................................................13

    4.  Opinion of Counsel. ......................................................................14

    5.  Stage of the Proceedings and Amount of Discovery Completed. 14

D.  Provisional Certification of the Settlement Class is Appropriate......15

E.  The Notice Program Should be Approved.........................................15

IV.  CONCLUSION.........................................................................................17

## Table of Authorities

**Cases**

Boggess v. Hogan
   410 F. Supp. 433 (N.D. Ill. 1975) ............................................................................................ 9

City of Detroit v. Grinnell
   495 F.2d 448 (2d Cir. 1974) ................................................................................................... 11

Gehrich v. Chase Bank USA, N.A.
   316 F.R.D. 215 (N.D. Ill. 2016) ............................................................................................ 11

In re Mexico Money Transfer Litig.
   164 F. Supp. 2d 1002 (N.D. Ill. 2000) .................................................................................. 14

Isby v. Bayh
   75 F.3d 1191 (7th Cir. 1996) ................................................................................................... 9

Kessler v. Am. Resorts International's Holiday Network, Ltd.
   2007 U.S. Dist. LEXIS 84450 (N.D. Ill. Nov. 14, 2007)....................................................... 9

Malta v. Fed. Home Loan Mortg. Corp.
   2013 U.S. Dist. LEXIS 15731 (S.D. Cal. Feb. 5, 2013) ....................................................... 11

Mullane v. Cent. Hanover Bank & Trust Co.
   339 U.S. 306 (1950)............................................................................................................... 15

Ossola et al. v. American Express Company, et al.
   Case No. 13-cv-4836 (N.D. Ill.) ........................................................................................... 10

Redman v. Radioshack Corp.
   2014 U.S. Dist. LEXIS 15880 (N.D. Ill. Feb. 7, 2014) .......................................................... 9

Schulte v. Fifth Third Bank
   805 F. Supp. 2d 560 (N.D. Ill. 2011) .................................................................................... 13

Synfuel Techs., Inc. v. DHL Express (USA), Inc.
   463 F.3d 646 (7th Cir. 2006) ............................................................................................. 8, 9

Wright v. Nationstar Mortg. LLC
   2016 U.S. Dist. LEXIS 115729 (N.D. Ill. Aug. 29, 2016)..................................................... 11

**Statutes**

47 U.S.C. § 227(b) ...................................................................................................................... 1

**Rules**

iii

Fed. R. Civ. P. 23(e)(1)(C) ...................................................................................................... 8

**Treatises**

H. Newberg, A. Conte, Newberg on Class Actions, § 11.41 (4th ed. 2002) .................................. 9

## I.    INTRODUCTION

Plaintiff Christy Griffith ("Plaintiff" or "Griffith") respectfully moves the Court for preliminary approval of the class action settlement ("Settlement" or "Settlement Agreement," attached hereto as Exhibit A) reached between Plaintiff and Defendant ContextMedia Health, LLC d/b/a Outcome Health ("Defendant" or "Outcome"). As discussed in more detail below, Plaintiff alleges, on behalf of herself and a class of similarly situated persons, that Defendant sent autodialed text messages to individuals after those individuals had opted out, in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(b). The proposed Settlement resolves all class claims in this matter.

Under the Settlement, Defendant is required to pay or cause to be paid $2,900,000 into a settlement fund ("Settlement Fund")[1] for a class of approximately 2,239 individuals who were sent 128,193 text messages after having opted out. Eligible claimants will receive a *pro rata* per-text payment from this Settlement Fund, which would pay approximately $95.91 per text at a claims rate covering 15 percent of text messages, after estimated administrative costs, and requested attorneys' fees, costs, and service award.[2] No money will revert to Defendant. Furthermore, as of March 2016, Defendant stopped its text messaging program at issue and has not resumed it.

## II.   BACKGROUND

### A.   Plaintiff's Allegations

This litigation arose from Plaintiff's allegations related to Defendant's "Healthy Tips" text messaging program. Plaintiff alleges that in approximately July 2015, she opted in to

---

[1] Unless otherwise specified, capitalized terms carry with them the same definitions contained in the Settlement Agreement.

[2] This would mean the total recovery for a class member would range from $95.91 (on one text, which is the fewest in the class) to $25,895.70 (on 270 texts, which is the most in the class). On the median number of text messages (49), recovery would be $4,699.59.

Defendant's "Healthy Tips" program, through which she would be sent via text message daily "health tips." [Dkt. 93, ¶ 17.] Immediately after opting in, Plaintiff began receiving text messages from Defendant. [*Id.* at ¶ 19.] Eventually, in approximately November 2015, Plaintiff decided that she no longer wanted to receive these text messages and sought to opt out by replying "stop" as instructed by the texts. [*Id.* at ¶ 24.] However, the texts did not stop. [*Id.*] Plaintiff sent a "stop" text message on at least six different occasions in 2015. [*Id.* at ¶ 25.] In 2016, Plaintiff continued her efforts to stop the text messages, writing "stop", as well as other phrases that evidenced a growing sense of frustration. [*Id.* at ¶¶ 27-29.] Plaintiff estimates that she received at least 80 text messages from Defendant after the first "stop" request. [*Id.* at ¶ 31.] Plaintiff alleges that all of these text messages were sent using an automatic telephone dialing system. [*Id.* at ¶ 33.]

### B. <u>Procedural History</u>

On March 7, 2016, Plaintiff Griffith filed a putative class action complaint alleging that the aforementioned practices violated the TCPA. On May 2, 2016, on Defendant's motion, the case was stayed pending the Supreme Court's then-pending decision in *Spokeo, Inc. v. Robins*. [Dkt. 13.] This stay was lifted on May 23, 2016. [Dkt. 17.] Plaintiff filed a First Amended Complaint on June 9, 2016 [Dkt. 18], a Second Amended Complaint on July 26, 2017 [Dkt. 59], and a Third Amended Complaint on January 12, 2018 [Dkt. 93].

### C. <u>Discovery and Motion Practice</u>

Discovery in this matter has been lengthy and thorough. Fact discovery closed on July 24, 2017. During fact discovery, Class Counsel took four depositions – two depositions of Defendant's representatives pursuant to Fed R. Civ. P. 30(b)(6) and two depositions of third-parties. Defendant also deposed Plaintiff Griffith. Plaintiff also served three sets of requests for production of documents, two sets of interrogatories, and two sets of requests for admission.

Declaration of Jeremy M. Glapion ("Glapion Decl."), ¶ 2.

Plaintiff also hired an expert, Mr. Dave Thomas, who reviewed Defendant's text messaging software at a code level and provided a detailed report as to the application's capabilities.[3] Expert discovery concluded on December 15, 2017.

On August 10, 2017 [Dkts. 60-61], Plaintiff moved to certify a class of 2,239 persons who had unsuccessfully sought to opt out of Defendant's text messaging program and continued to be sent text messages. Defendant opposed on September 29, 2017 [Dkt. 76], and Plaintiff replied on October 13, 2017 [Dkt. 82]. The Court granted Plaintiff's Motion on January 11, 2018, certifying the following class:

> Plaintiff and all persons within the United States to whose cellular telephone number Defendant ContextMedia Health, LLC sent, between July 28, 2015 and March 31, 2016, a text message, other than an opt-out confirmation text message, as part of its "Healthy Tips" campaign, after Defendant's records or the records of any entity with whom Defendant contracted to provide text messaging services, indicate that the telephone number to which the text messages were sent had previously sent a text message with the single word "STOP" or the single phrase "STOP CMH TIPS", regardless of capitalization.

[Dkt. 92.]

### D. **Mediation**

While Plaintiff's Motion for Class Certification was pending, the Parties agreed to participate in a private mediation with the Honorable James F. Holderman (ret.) of JAMS (the "Mediation"). The Mediation was held on October 16, 2017. Though the Parties made progress toward a resolution, the Parties were unable to resolve the case at that time.

### E. **Defendant's Business Situation**

Contributing to the failure of the Mediation to resolve this matter was that, three days prior to the mediation, the Wall Street Journal ran a story alleging that Defendant defrauded its

---

[3] Class Counsel also undertook efforts to learn the coding language of Defendant's application to be able to more easily instruct the expert and follow along with his findings. Glapion Decl., ¶ 4.

advertisers and investors. These allegations, regardless of their merits, appeared to place Defendant, which had received outside investments totaling nearly $500 million just a few months prior, in a difficult situation. Shortly after the story broke, Defendant's investors sued Defendant, seeking to, among other things, rescind the investment, and the public reporting on Defendant's financial situation was negative. Based on this publicly available information and obtained discovery, there appeared to be a risk that the class would be unable to recover if the litigation continued much longer. Glapion Decl., ¶ 9.

**F.** **The Settlement**

After months of negotiations, considering both the merits of the case and the risks attendant to continued litigation, the Parties were able to reach a settlement. The relevant details are set forth herein.

**1.** **Defined Class**

The proposed Settlement Class[4] is defined as follows:

> [A]ll persons within the United States to whose cellular telephone number Defendant ContextMedia Health, LLC sent, or caused to be sent, a text message, other than an opt-out confirmation text message, as part of its "Healthy Tips" campaign, after Defendant's records or the records of any entity with whom Defendant contracted to provide text messaging services indicate that the telephone number to which the text messages were sent had previously sent a text message with the single word "STOP" or the single phrase "STOP CMH TIPS," regardless of capitalization.

Settlement Agreement § 2.29. The Class consists of approximately 2,239 persons who were sent 128,293 text messages.

---

[4] Excluded from the Settlement Class are: (1) the Judges presiding over the Action and members of their families; (2) the Defendant, its subsidiaries, parent companies, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former officers, directors, and employees; (3) Persons who properly execute and file a timely request for exclusion from the Settlement Class; (4) all Persons whose claims against the Defendant have been fully and finally adjudicated and/or released; and (5) the legal representatives, successors or assigns of any such excluded Persons.

## 2. Monetary Relief

The Settlement Agreement requires Defendant to create a non-reversionary fund of $2,900,000. Settlement Agreement § 4.02. This fund will be used to provide cash awards to eligible claimants who file an approved claim, as well as cover all administrative costs and attorneys' fees and attorneys' costs. *Id.* Each claimant who files an Approved Claim will receive a *pro rata* per-text amount based on the number of text messages sent to a claimant after he or she opted out of receiving text messages. *Id.* § 4.04.

To submit a claim, members of the Class will need to fill out and submit a claim form. This can be done electronically through the Settlement Website or via U.S. mail, including through a postage-paid claims form to be included with the notice. *Id.* § 9.02. Checks will be mailed to those submitting Approved Claims within thirty (30) days of the Effective Date.[5] *Id.* § 9.03 These checks will be valid for 180 days. *Id.*

Class Members will receive an award of approximately $95.91 at a claims rate covering 15 percent of text messages, after deducting estimated fees, costs, and Plaintiff's incentive award. Given the amount of money claimants can potentially recover, however, Class Counsel believes the number of text message claims may be significantly higher. With 50 percent of all text messages claimed, Class Members will receive $28.77 per text (or $1,409.73 for the median number of texts).

## 3. Redistribution and Cy Pres

Should checks remain uncashed after 210 days of the first distribution, and the amount of uncashed checks result in an amount of $1.00 per claimed text message or more, this remaining amount will be distributed to those who previously filed an Approved Claim and cashed their

---

[5] "Effective Date" means the date on which the judgment becomes final. Settlement Agreement, §§ 2.18, 12.01.

check. In the event the amount uncashed is less than $1.00 per claimed text message, the amount will be distributed *cy pres* to the American Diabetes Association, or another recipient approved by the Court. *Id.* No amount will revert to Defendant under any circumstances. *Id.*

### 4. Prospective Relief

Though not a direct condition of the Settlement, Defendant ceased the "Healthy Tips" program as of March 2016 and has not resumed it. Defendant has also agreed to withdraw a petition it filed with the FCC for an exemption from liability in this case. Settlement Agreement, § 13.05

### 5. Release

Upon the Effective Date, members of the Settlement Class who do not opt out will have released all Released Claims[6] against each and every one of the Released Parties.[7] *Id.* § 13.04. Plaintiff and Settlement Class members further agree not to sue any of the Released Parties with respect to any of the Released Claims, and agree to be forever barred from doing so in any court of law or equity, arbitration proceeding, or any other forum. *Id.* However, nothing in the Settlement Agreement is intended to restrict any Settlement Class Member from contacting,

---

[6] Defined as "any and all claims, causes of action, suits, obligations, debts, demands, agreements, promises, liabilities, damages, losses, controversies, costs, expenses and attorneys' fees of any nature whatsoever, whether based on any federal law, state law, common law, territorial law, foreign law, contract, rule, regulation, any regulatory promulgation (including, but not limited to, any opinion or declaratory ruling), common law or equity, whether known or unknown, suspected or unsuspected, asserted or unasserted, foreseen or unforeseen, actual or contingent, liquidated or unliquidated, punitive or compensatory, as of the date of the Final Approval Order, that relate to or arise out of any Text, attempted Text, telephone call, or attempted telephone call, to any Settlement Class Members, by or on behalf of Defendant or the Released Parties." *Id.* at § 13.01.

[7] Defined as "ContextMedia and each of its respective past, present and future parents, subsidiaries, affiliated companies and corporations, any company claiming to do business as Outcome Health, and each of their respective past, present, and future directors, officers, managers, employees, general partners, limited partners, principals, insurers, reinsurers, shareholders, attorneys, advisors, representatives, predecessors, successors, divisions, assigns, or related entities, and each of their respective executors, successors, and legal representatives, as well as any person or entity on whose behalf ContextMedia sent Texts." *Id.* § 2.28.

6

assisting or cooperating with any government agency. *Id.*

### 6. Service Award

The Settlement reflects that Plaintiff Griffith will seek a $10,000 service award. *Id.* § 5.04. This award will be paid out of the Settlement Fund. *Id.* This award is subject to this Court's approval, and the Settlement is not conditioned on the Court awarding the requested service award (or any service award). *Id.* The award is warranted. Plaintiff has worked with Class Counsel to advance the case since the beginning and has been extremely cooperative and communicative. Plaintiff timely responded to Defendant's discovery requests and sat for a difficult deposition in Chicago (after traveling from her home in North Carolina). She provided valuable and responsive input and feedback into the case, and her contribution to the litigation served the interest of the Class members. Glapion Decl., ¶ 3.

### 7. Attorneys' Fees and Costs

Class Counsel intends to apply to the Court for an award of attorneys' fees and costs. *Id.* § 5.02. As will be addressed in more detail in Class Counsel's forthcoming Motion for Attorneys' Fees, to be filed on the schedule set by the Court, Class Counsel intends to ask for $966,666.67 in fees, which is one-third of the Fund (and 34.37% after costs and the requested service award), and is in line with the precedent in the Seventh Circuit and appropriate to compensate Class Counsel for achieving the relief described herein. *Id.* The Settlement is not contingent upon the Court's approval of attorneys' fees or costs, and the notice to class members will inform the class members that Class Counsel intends to seek up to $966,666.67 and their costs.

### 8. Administration and Notice

The Claims Administrator will be Epiq Class Action & Claims Solutions, Inc. ("Epiq"). All costs of notice and administration shall be paid from the Settlement Fund. *Id.* § 2.17. The

Claims Administrator shall administer the Settlement, which includes, but is not limited to, performing lookups to ascertain the identities of certain members of the Class, processing claims, disseminating notice, maintaining records, providing reports to Class Counsel and Defendant's counsel, creating the settlement website, establishing and maintaining the toll-free telephone number, and issuing all settlement payments contemplated herein.

To identify Class Members, Class Counsel has issued subpoenas to Verizon, T-Mobile, AT&T, and Sprint for subscriber information. These subpoenas cover approximately 96% of Class Members. For those whose information is not provided in response to one of these subpoenas – either due to state laws or due to being a customer of a different carrier than one of those mentioned above – the Administrator will perform a reverse lookup to identify the owner of the telephone number during the time of the text messages. Settlement Agreement, § 8.02.

No later than June 29, 2018, or twenty-five (25) days after Preliminary Approval Order is issued – whichever is later – the Administrator will provide mailed notice, with a prepaid claim form, to those persons identified. This claim form will, among other things, request that the Class Member provide the number to which the messages were sent and the name of the primary user for that telephone number. Settlement Agreement, § 9.02. A draft of this mailed notice and claim form is included in Exhibit A to the Settlement Agreement.

In the event of a mismatch between the telephone number provided by a Class Member on a claim form, the Administrator will send a deficient claim notice explaining that there was a mismatch, and requesting that the Class Member either 1) provide the name and telephone number of the person who actually received the messages or, if not sure, 2) provide a list of all telephone numbers (and the name of the primary user of that number) on the account during the time of the text messages. Settlement Agreement, § 8.06. A draft of this deficient claim notice is

included in Exhibit A of the Settlement Agreement.

Class Members will also be notified via ads on Facebook, targeted to Class Members using their phone numbers. A draft of this targeted ad is included in Exhibit B of the Settlement Agreement. There will also be a settlement website providing access to a downloadable claim form (included in Exhibit A to the Settlement Agreement), a long form notice document (included in Exhibit B to the Settlement Agreement), important case documents, important case deadlines, and on which Class Members can file a claim. Settlement Agreement, § 8.04.

## III.    DISCUSSION

### A.  Legal Standard for Approval

"A district court may approve a settlement only if it is 'fair, reasonable, and adequate.'" *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 652 (7th Cir. 2006) (citing Fed. R. Civ. P. 23(e)(1)(C). When the proposed settlement "is the product of arm's length negotiations, sufficient discovery has been taken to allow the parties and the court to act intelligently, and counsel involved are competent and experienced", there is a general presumption of fairness. H. Newberg, A. Conte, Newberg on Class Actions, § 11.41 (4th ed. 2002); *Boggess v. Hogan*, 410 F. Supp. 433, 438 (N.D. Ill. 1975). Nevertheless, even where there have been arm's-length negotiations, courts must independently scrutinize the fairness, reasonableness, and adequacy of the proposed Settlement. Specifically, "a district court must consider 'the strength of plaintiffs' case compared to the amount of defendants' settlement offer, an assessment of the likely complexity, length and expense of the litigation, an evaluation of the amount of opposition to settlement among affected parties, the opinion of competent counsel, and the stage of the proceedings and the amount of discovery completed at the time of settlement.'" *Synfuel Techs., Inc.*, 463 F.3d at 653. (quoting *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996)). The first factor – the strength of the plaintiff's case balanced against the amount

offered in the settlement – is the most important. *Id.* While these factors are ultimately factors to be considered at the final fairness hearing, which comes after a court finds the proposed settlement is within approval range, courts in the Seventh Circuit routinely consider a summary version of these factors at the preliminary phase. *See, e.g.*, *Kessler v. Am. Resorts International's Holiday Network, Ltd.*, Case No. 5-cv-5944, 2007 U.S. Dist. LEXIS 84450, *17 (N.D. Ill. Nov. 14, 2007). These factors should be considered in the light most favorable to the settlement. *Redman v. Radioshack Corp.*, Case No. 11-cv-67141, 2014 U.S. Dist. LEXIS 15880, *9 (N.D. Ill. Feb. 7, 2014).

### B. The Settlement is the Product of Arm's Length Negotiations.

The Settlement herein was reached after nearly two years of litigation, extensive discovery, several dispositive motions, and an all-day mediation before Judge Holderman followed by additional investigation, discussion, and negotiation. Class Counsel investigated and developed this case through discovery, multiple depositions, and expert discovery, ultimately developing a sufficient record to certify the class and, Class Counsel believes, prevail on the merits.

Throughout, the Parties were in strong disagreement on every aspect of this case, and these disagreements were expressed at a lengthy and often frustrating mediation. Indeed, the mediation did not immediately resolve the Parties' differences and it took three more months of litigation and discussion to resolve. Class Counsel even expressed doubts on the record that the matter would be resolved without a decision on class certification. [Dkt. 87.] The Settlement was thus reached after arm's-length negotiations, and there was no collusion.

### C. The Settlement is Well Within the "Range of Reasonableness."

#### 1. The Settlement Provides Substantial Relief in Light of the Risks of Continued Litigation.

a. <u>Settlement Benefits</u>

The Settlement requires Defendant to pay or cause to be paid $2,900,000, from which all approved claims will be paid *pro rata* per text after fees and costs. Settlement Agreement § 4.04. None of this money will revert to Defendant, no matter the claims rate. Further, under no circumstance, will Defendant pay more than $2,900,000 (which total includes all claims, administrative fees, costs, fees, etc.). Assuming a claims rate covering 15 percent of text messages, after estimated administrative costs, and requested attorneys' fees, costs, and service award, Class Counsel estimates that each claimant will receive $95.91 per text. This is an exceptional result for three main reasons.

First, it significantly exceeds the award in many other approved TCPA class action settlements. Just recently, the Northern District of Illinois recently granted final approval to a TCPA class settlement in which each claimant would be paid $89 *total* on a 6.9% claims rate. *Ossola et al. v. American Express Company, et al.*, Case No. 13-cv-4836 (N.D. Ill.) (Dkt. 368.). If 6.9% of text messages were claimed here, the Settlement would pay each claimant approximately $208.49 *per text*. For a class member with the median number of text messages (49), would be $10,216.01. The Settlement here also meets or exceeds the relief in other TCPA settlements. *See, e.g., Wright v. Nationstar Mortg. LLC,* Case No. 14-cv-10457, 2016 U.S. Dist. LEXIS 115729 (N.D. Ill. Aug. 29, 2016) (finally approving settlement of $12.1 million for a class of 2.3 million people, where each claimant would receive $45); *Gehrich v. Chase Bank USA, N.A.,* 316 F.R.D. 215 (N.D. Ill. 2016) (approving settlement that paid $52.50 to each claimant); *Malta v. Fed. Home Loan Mortg. Corp.,* No. 10-cv-1290, 2013 U.S. Dist. LEXIS 15731 (S.D. Cal. Feb. 5, 2013) (preliminarily approving $17.1 million settlement to 5,887,508 class members; final approval granted at Dkt. No. 91).

Second, while the Settlement does not provide full statutory relief, this "does not, in and

of itself, mean that the proposed settlement is grossly inadequate and should be disapproved."

*City of Detroit v. Grinnell*, 495 F.2d 448, 455 n.2 (2d Cir. 1974). This is particularly true here. While 47 U.S.C. § 227(b) mandates a *minimum* of $500 per call or text in violation of the statute, which would amount to $64 million here, such a judgment would be worth nothing if it could not be collected, as appears likely to be the case. It is also possible that Defendant will prevail on its pending request for exemption from the FCC on the basis that these unwanted text messages were allegedly caused by a technical glitch, or that the D.C. Circuit opinion related to the FCC's 2015 Order may impact this case in unpredictable ways, depending on any further appeal of the D.C. Circuit's opinion, or subsequent rule-making from the FCC. Glapion Decl. ¶¶ 10-11.

Third, this Settlement allows for real relief much sooner than would come in its absence. Trial is, at best, four to six months away, and even if that schedule were kept and Plaintiff prevailed, the subsequent appeals would add years. Guaranteeing a sizable Settlement to the Class now far outweighs the potential benefit of proceeding to trial and verdict. Glapion Decl. ¶ 12.

With these factors considered, the compromise amount of $2,900,000 is fair, reasonable, and adequate.

### b. Strength of Plaintiff's Case

Plaintiff continues to believe in the strength of her case. She has prevailed on every merits-related motion to date and has successfully certified a class. Plaintiff's expert report is strong, and, barring a change in the law, Plaintiff has a clear (although not guaranteed) path to showing Defendant's liability for statutory damages under the TCPA.

Liability, however, is only part of the equation. There is little value in a judgment that cannot be collected due to the finances of Defendant. There is real question about Defendant's ability to pay a judgment of $64 million, and it appears, by all accounts, that collecting such a

judgment would be unlikely. The Settlement amount strikes a balance between providing genuine relief for Class Members and the risks of nonpayment (either due to a loss on the merits or Defendant's viability) due to continued litigation. Glapion Decl. ¶ 13.

In addition, as mentioned, Defendant has filed a request for exemption from the FCC, which was subsequently supported by numerous large and well-connected interested parties, including the American Bankers Association and the U.S. Chamber Institute for Legal Reform. Were the FCC to grant Defendant's exemption, it would present Defendant with an avenue to escape liability altogether, and would, at minimum, delay this case significantly as the Parties would be forced to re-open certain aspects of discovery. Furthermore, the D.C. Circuit recently decided the appeal of the FCC's 2015 Order. While Plaintiff believes that there is little in the Order that would directly impact the case here, reasonable minds disagree, and it is impossible to know how the Order will be applied or subsequently appealed. Glapion Decl. ¶¶ 11-12.

### 2. Continued Litigation is Not in the Best Interests of Plaintiff or Members of the Class.

As discussed, because of concerns about Defendant's ability to pay, as well as uncertainties in the TCPA legal landscape, it is a genuine possibility that, no matter how strong Plaintiff's claims look now, when all is said and done, Class Members would recover little, if anything. The Settlement allows for definite relief and, all things considered, will increase the likelihood of recovery relative to continued litigation. *See Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 586 (N.D. Ill. 2011) ("Settlement allows the class to avoid the inherent risk, complexity, time, and cost associated with continued litigation.").

### 3. Opposition to the Settlement.

As notice has not been sent out yet, this factor cannot yet be evaluated. It will be discussed further in Plaintiff's Motion for Final Approval. Class Counsel and Defendant's

counsel support this Settlement.

### 4. Opinion of Counsel.

Class Counsel strongly believes this Settlement is not only fair, but exceptional. As set forth above, eligible claimants will likely receive *per text* what many TCPA class settlements pay *per member*. It is a near certainty that some Class Members will see payments north of $1,000 as a result. In a hypothetical situation where 50 percent of all text messages claimed, Class Members will receive $28.77 per text (or $1,409.73 for the median number of texts), after estimated costs and sought attorneys' fees, costs, and service awards. Glapion Decl. ¶ 13.

Cumulatively, Class Counsel have litigated dozens, if not hundreds, of TCPA cases, have experience litigating numerous other TCPA class actions as lead counsel, have extensively studied and reviewed the TCPA class action landscape as part of their practice, and have litigated this particular case through discovery and motion practice, which enable them to effectively evaluate the Settlement. *See, e.g. In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1020 (N.D. Ill. 2000) (giving significant weight to "the unanimously strong endorsement" by "well-respected attorneys."). Glapion Decl. ¶ 15.

### 5. Stage of the Proceedings and Amount of Discovery Completed.

As mentioned, Class Counsel took four depositions – two depositions pursuant to Rule 30(b)(6), and two depositions of third-parties (one of Defendant's former employees and Defendant's text messaging provider). Defendant served written discovery and deposed Plaintiff Griffith. Plaintiff also served three sets of request for production and two sets of interrogatories and requests for admission. Furthermore, Plaintiff hired an expert, Mr. Dave Thomas, who reviewed Defendant's text messaging software at a code level and provided a detailed report as to the application's capabilities. Glapion Decl. ¶¶ 2-4.

There has also been significant, meaningful, and dispositive motion practice. Plaintiff

14

successfully opposed Defendant's Motion to Dismiss, and, on January 11, 2018, successfully certified her proposed class. A different result on either motion would have effectively ended this case.

### D.  Provisional Certification of the Settlement Class is Appropriate.

As the Court has already, and very recently, certified a virtually identical class, Plaintiff will not repeat the arguments made in favor of Class Certification here, and instead relies on Plaintiff's briefing in support of class certification, docket entries 60 and 82. The only difference between the Settlement Class definition and the certified class definition is the removal of the date restriction. Based on discovery conducted to date and Defendant's representations upon agreeing to the Settlement, this does not impact the class size or scope in any way.

### E.  The Notice Program Should be Approved.

A court is required to "direct notice in a reasonable manner to all class members who would be bound by [a proposed settlement, voluntary dismissal, or compromise]." Fed. R. Civ. P. 23(e)(1). The notice must be "reasonably calculated … to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). Here, Class Counsel proposes a robust notice program that should reach most Class Members.

***First***, Class Counsel has issued and received a response back from Neustar, Inc., which is the entity responsible for managing and routing all telephone numbers and calls in the United States. Neustar provided the identity of the wireless service provider(s) for each telephone number in the class during the time-period which class members received text messages after texting "STOP" or "STOP CMH TIPS".

***Second***, as of February 8, 2018, Class Counsel has sent subpoenas to Verizon, Cingular/AT&T, Sprint, and T-Mobile for the names and addresses associated with the telephone

15

numbers Neustar identified as belonging to those respective carriers during the time-period of the text messages at issue. These subpoenas cover nearly 96% of all Class Members (or the account holder for the account on which a Class Member's phone number appears).

*Third***,** Epiq will perform a reverse look up for the remaining 4% of Class Members to ascertain their names and addresses, as well as for the Class Members whose information was not provided in response to the subpoenas (such as due to the state laws).

*Fourth***,** once the names and addresses of Class Members who can reasonably be located and identified through the above described processes are known, Epiq will send notice, attached as Exhibit B, via U.S. mail. This notice will provide extensive information to Class Members on the terms of the Settlement, and their rights, obligations, and responsibilities under the Settlement. The notice will define the Class, describe the options and deadlines for taking action, describe the terms of the proposed Settlement, disclose the sought attorneys' fees and requested service awards, provide information on the time and place of the final fairness hearing as well as information on how to object or opt out, explain the procedures for distributing the settlement funds, and prominently display the address and phone number of the involved attorneys, as well as a toll-free number for making inquiries, and the Settlement website. The notice will also provide information sufficient to enable prospective class members to easily determine if they are members of either Class. The claim form will request, among other things, the telephone number that received the messages and the name of the user of that phone.

*Fifth*, the Administrator will target Facebook ads at Class Members by using their telephone numbers. A draft of this targeted ad is included in Exhibit B to the Settlement Agreement.

*Sixth*, if the telephone number provided by a Class Member does not match the number

16

associated with that particular Class Member's claim identification number, the Administrator will send a deficient claim notice explaining the deficiency and asking the recipient to 1) provide the name and telephone number of the person who actually received the messages or, if not sure, 2) provide a list of all telephone numbers (and the name of the primary user of that number) on the account during the time of the text messages.

Class Members will be able to file a claim via a pre-paid detachable post-card included with the mailed notice, via a claim form that can be requested through the website or from the administrator, and directly through the Settlement website. Drafts of the claim form and the proposed notice are attached to the Settlement Agreement as Exhibits A and B.

## IV.    CONCLUSION

Plaintiff respectfully requests that the Court 1) preliminarily approve the proposed Settlement; 2) conditionally certify the proposed Class; 3) appoint Plaintiff's attorney Jeremy M. Glapion of Glapion Law Firm and Kristen Law Sagafi and Andrew Silver of Tycko & Zavareei LLP as Class Counsel; 4) approve the proposed Notice and Claims program; 5) direct that Notice be provided pursuant to the terms of the Settlement Agreement; 6) establish procedures for members to object to the Settlement or exclude themselves from the Settlement Class; 7) set the deadlines for objections or exclusions at 45 days after the Notice deadline; 8) stay all proceedings except those related to effectuating the Settlement; 9) schedule a final approval hearing; and 10) set any other dates and deadlines the Court deems necessary, including deadlines for Plaintiff's Motion for Attorneys' Fees, Costs, and Service Awards. Specifically, Plaintiff proposes the following schedule:

| Later of June 29, 2018[8] or 25 days after preliminary approval is granted | Deadline for Notice to be Provided |
|---|---|
| 14 days after notice deadline | Deadline for Fee Petition |
| 45 days after notice deadline | Deadline to file objections or request exclusion |
| 90 days after notice deadline | Deadline for Members to Submit a Claim |
| 105 days after notice deadline | Deadline to file the list of exclusions, proof of notice, and final approval motion and memorandum. |
| 120 days after notice deadline | Final Approval Hearing |

Dated: April 3, 2018

/s/ Jeremy M. Glapion
Jeremy M. Glapion
**THE GLAPION LAW FIRM, LLC**
1704 Maxwell Drive
Wall, New Jersey 07719
Tel: 732.455.9737
Fax: 732.709.5150
jmg@glapionlaw.com

---

[8] The Parties propose this lengthier schedule because of the uncertainty of timing for carrier responses to Plaintiff's subpoenas. Verizon and Sprint have provided their responses. Cingular/AT&T said 12 weeks and has not yet provided a response. T-Mobile said four weeks and has not yet provided a response. The June 29, 2018, date is 35 days after 15 weeks from the service of the subpoena on Verizon. In the event the Parties need longer due to slower than expected subpoena response times, the Parties will jointly submit a new proposed schedule to the Court.