**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **CHRISTY GRIFFITH**, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**CONTEXTMEDIA HEALTH, LLC d/b/a OUTCOME HEALTH**<br><br>Defendant. | Case No.: 1:16-cv-02900<br><br>Honorable Elaine E. Bucklo |

**PLAINTIFF'S MOTION AND SUPPORTING MEMORANDUM FOR ATTORNEYS'**
**FEES, COSTS, AND SERVICE AWARD**

Table of Contents

I.    INTRODUCTION................................................................................................. 1

II.   BACKGROUND AND SETTLEMENT ................................................................ 2

   A.   PLAINTIFFS' ALLEGATIONS....................................................................... 2

   B.   LITIGATION HISTORY ................................................................................. 2

   C.   SETTLEMENT................................................................................................. 3

III.  DISCUSSION ........................................................................................................ 5

   A.   LEGAL STANDARD FOR ATTORNEYS' FEES ............................................. 5

   B.   COUNSEL'S REQUEST IS WITHIN THE "MARKET RATE". ......................... 6

      1.   The Market Rate for TCPA Class Action Settlements.......................... 6

      2.   The Synthroid I Factors Support the Requested Fee and Risk Adjustment. ....... 7

         a.   Risk of Nonpayment ...................................................................... 10

         b.   Class Counsel's Performance. ...................................................... 11

         c.   Amount of Work Necessary to Resolve the Litigation................. 11

      3.   Class Counsel's Proposed Risk Adjustment is Reasonable. ............................. 12

      4.   The Requested Fee is in Line with Other TCPA Settlements. ........................... 13

      5.   The Requested Fee is in Line with the Representation Agreement.................... 14

   C.   CLASS COUNSEL'S COSTS ARE REASONABLE. ........................................ 14

   D.   THE SERVICE AWARD TO PLAINTIFF SHOULD BE APPROVED. ............... 15

IV.   CONCLUSION ...................................................................................................... 15

**Cases**

*Allen v. Chase*
13-cv-8285 .................................................................................................................. 13

*American Art China, Co. v. Foxfire Printing & Packaging, Inc.*
743 F.3d 243 (7th Cir. 2014) ....................................................................................... 5

*Aranda v. Caribbean Cruise Line, Inc.*
2017 U.S. Dist. LEXIS 52645 (N.D. Ill. Apr. 6, 2017) ...................................... passim

*Cook v. Niedert*
142 F.3d 1004 (7th Cir. 1998) ................................................................................... 15

*Cook v. Niedert*, 142 F.3d 1004
(7th Cir. 1998).............................................................................................................. 5

*Craftwood Lumber Co. v. Interline Brands, Inc.*
2015 U.S. Dist. LEXIS 35421 (N.D. Ill. Mar. 23, 2015).................................... 6, 7, 11

*Florin v. Nationsbank of Ga., N.A.*
34 F.3d 560 (7th Cir. 1994) ...................................................................................... 10

*Gaskill v. Gordon*
160 F.3d 361 (7th Cir. 1998) ................................................................................... 14

*Gehrich v. Chase Bank USA, N.A.*
316 F.R.D. 215 (N.D. Ill. 2016)................................................................................... 7

*In re Capital One Tel. Consumer Prot. Act Litig.*
80 F. Supp. 3d 781 (N.D. Ill. 2015) ................................................................... passim

*In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.*
80 F. Supp. 3d 838 (N.D. Ill. 2015) ........................................................................... 5

*In re Ky. Grilled Chicken Coupon Mktg. & Sales Practices Litig.*
280 F.R.D. 364 (N.D. Ill. 2011).................................................................................. 5

*In re Synthroid Mktg. Litig.*
264 F.3d 712 (7th Cir. 2001) ........................................................................... 5, 6, 10

*In re Synthroid Mktg. Litig.*
325 F.3d 974 (7th Cir. 2003) .............................................................................. 7, 13

*Kirchoff v. Flynn*
786 F.2d 320 (7th Cir. 1986) ................................................................................... 14

*Kolinek v. Walgreen Co.*
311 F.R.D. 483 (N.D. Ill. 2015) ................................................................................. 5, 13, 15

*Martin v. JTH Tax*
13-cv-6923 ................................................................................................................... 13

*Ossola et al. v. American Express Company et al.*
Case No. 13-cv-4836 (N.D. Ill. Dec. 2, 2016) ......................................................... 6, 13

*Pearson v. NBTY, Inc.*
772 F.3d 778 (7th Cir. 2014) ....................................................................................... 14

*Silverman v. Motorola Solutions, Inc.*
739 F.3d 956 (7th Cir. 2013) ..................................................................................... 5, 9

*Taubenfeld v. AON Corp.*
415 F.3d 597 (7th Cir. 2005) ....................................................................................... 14

*Wilkins v. HSBC Bank Nev., N.A.*
2015 U.S. Dist. LEXIS 23869 (N.D. Ill. Feb. 27, 2015) ......................................... 8, 13

*Wright v. Nationstar Mortg. LLC*
2016 U.S. Dist. LEXIS 115729 (N.D. Ill. Aug. 29, 2016) ............................................. 6

**Rules**

Fed. R. Civ. P. 23(h) ......................................................................................................... 5

## I.   INTRODUCTION

On April 4, 2018, the Court preliminarily approved a class action settlement ("Settlement") between Plaintiff Christy Griffith ("Plaintiff") and Defendant ContextMedia Health, LLC. ("CMH"). The Settlement came after more than two years of litigation, including full discovery, multiple dispositive motions, and a mediation with retired Judge James F. Holderman.

The Settlement creates a $2,900,000 non-reversionary fund ("Settlement Fund") from which all eligible claimants will be paid *pro rata* on a per text message basis. After estimated administrative costs, incentive awards, and the fees and costs sought in this Motion, Class Members will receive approximately $137 per text on a claims rate of ten percent and $274 per text on a claims rate of five percent. Put into perspective, at the median number of texts (49), this would be $6,713 to $13,426. For the Class Member with the most texts in the class – 270 – this will be $36,990 to $73,980. Even with an impossible 100 percent claims rate, Class Members would receive almost $14 per text, or $686 per class member at the median and $3,780 per class member at the high end. CMH has also shut down its Healthy Tips program that resulted in the offending text messages.  This result is exceptional whether considered on its own or compared to other recent Telephone Consumer Protection Act ("TCPA") settlements. To Class Counsel's knowledge, it will result in one of the largest recovery-per-class-member TCPA settlements ever. Thus, the benefit conferred upon Class Members is substantial and real.

Now, Class Counsel respectfully moves the Court for an award of attorneys' fees of $966,666.67. This award reflects 33 percent of the Settlement Fund. This is in line with (and actually below) the Seventh Circuit's guidance and comparable cases. It is also reasonable when considering the risks of this case, the quality of the work performed, and the result. Class Counsel also requests $68,910.73 in costs. Finally, Class Counsel respectfully asks the Court to approve a

1

service award of $10,000 to Plaintiff Griffith for her work on behalf of the Class.

## II.     BACKGROUND AND SETTLEMENT

### A.  Plaintiffs' Allegations

Plaintiff's allegations have been recounted at length previously in briefing before this Court. To briefly summarize, however, on March 7, 2016, Plaintiff Christy Griffith filed a complaint, on behalf of herself and all others similarly situated, alleging that Defendant continued to send her automated text messages after she sought, repeatedly, to opt out. Plaintiff's alleged opt-out attempts included frustrated responses, such as "for the love of God please stop", as well as the specific language Defendant itself provided in some of its text messages to Plaintiff ("stop"). Plaintiff alleged that this conduct violated the TCPA.

### B.  Litigation History

In the more than two years since this case was first filed, it has been hard fought and thoroughly litigated. There has been both significant discovery and extensive motion practice. With respect to the discovery, Plaintiff served three sets of requests for production, two sets of interrogatories, and two sets of requests for admission. Plaintiff also took four depositions – two of the depositions were of Defendant's 30(b)(6) witnesses, one was of Defendant's former employee, and one was of Defendant's text messaging service provider. The 30(b)(6) depositions in particular were lengthy, difficult, and often contentious. Defendant, for its part, not only served discovery requests on Plaintiff Griffith, but took Plaintiff Griffith's deposition in Illinois (which necessitated travel from her home in North Carolina). *See* Declaration of Jeremy Glapion ("Glapion Decl."), ¶ 3. Plaintiff also retained an expert to review Defendant's text messaging program and write an expert report. Finally, Class Counsel traveled to Washington D.C. to meet with the FCC regarding a petition Defendant filed seeking an exemption from liability for text

messages allegedly sent as the result of a technical error. *Id.* ¶ 7.

Motion practice was similarly involved. Immediately after Plaintiff filed the complaint, Defendant successfully moved to stay the case until the then-pending *Spokeo* case was decided by the Supreme Court. [Dkt. 13.] This stay was short-lived as the decision came down a short time later and the stay was lifted. [Dkt. 17.] Defendant then sought to dismiss Plaintiff's case in reliance on the Supreme Court's *Spokeo* decision. [Dkt. 19.] The resulting briefing was some of the first post-*Spokeo* briefing on Article III standing in the TCPA context. Plaintiff prevailed on the substantive issues raised in Defendant's Motion. [Dkt. 32.]

On August 10, 2017, after the conclusion of discovery, Plaintiff filed her Motion for Class Certification. [Dkt. 60.] This led to briefing on the motion itself as well as a related Motion to Strike filed by Defendant [Dkt. 73], which led to briefing of its own. Prior to the filing of this Motion for Class Certification, no class-wide settlement had been seriously discussed. On October 16, 2017, while the Motion for Class Certification was pending, the Parties went to mediation before the Hon. James F. Holderman (Ret.). This mediation was unsuccessful. On January 11, 2018, the Court granted Plaintiff's Motion for Class Certification. [Dkt. 91.] Less than two weeks later, the parties reached an agreement.

### C. <u>Settlement</u>

The Settlement Agreement requires Defendant to create a non-reversionary settlement fund of $2,900,000. This fund will be used to provide cash awards to eligible claimants who file an approved claim, as well as cover all administrative costs and attorneys' fees and costs. Each claimant who files an approved claim will receive a *pro rata* amount per text message sent to that claimant's phone number, based on the total number of text messages for other. After administrative costs (estimated to be approximately $85,000), any incentive award, and the fees

3

and costs sought in this Motion, Class Members will receive approximately $137 per text on a claims rate of ten percent and $274 per text on a claims rate of five percent. Put into perspective, at the median number of texts (49), this would be $6,713 to $13,426. While the claims rate will likely be higher than five to ten percent, given the amount of money at stake, even with an impossible 100 percent claims rate, Class Members would receive approximately $14 per text, or $686 at the median number of texts and $3,780 at the high end.

Should checks exceeding $1.00 per claimed Text (net after expected costs) remain uncashed, this remaining amount will be distributed to those who previously filed an approved claim (and cashed their check), and those whose claim would have been an approved claim but for the fact it was untimely. Should there be less than this amount, the remaining amount will be distributed *cy pres* to the American Diabetes Association. CMH has also shut down its Healthy Tips program and has agreed to withdraw a petition it filed with the FCC for an exemption from the TCPA for texts allegedly sent due to a technical error.

On April 4, 2018, the Court preliminarily approved the Settlement and the following class was certified for settlement purposes:

> [A]ll persons within the United States to whose cellular telephone number Defendant ContextMedia Health, LLC sent, or caused to be sent, a text message, other than an opt-out confirmation text message, as part of its "Healthy Tips" campaign, after Defendant's records or the records of any entity with whom Defendant contracted to provide text messaging services indicate that the telephone number to which the text messages were sent had previously sent a text message with the single word "STOP" or the single phrase "STOP CMH TIPS," regardless of capitalization.

Plaintiff now respectfully requests that the Court award attorneys' fees of $966,666.67 and costs of $68,910.73. This is in line with the market rate, reflects the risks of the case and substantial results obtained, and comports with Seventh Circuit guidance and the practice in this District.

4

### III.    DISCUSSION

#### A.  <u>Legal Standard for Attorneys' Fees</u>

"In a certified class action, the court may award reasonable attorney's fees … that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). "[A]ttorneys' fees in class actions should approximate the market rate that prevails between willing buyers and willing sellers of legal services." *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 957 (7th Cir. 2013). In a common-fund case, "courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) ("*Synthroid I*").

Seventh Circuit courts have discretion to use one of two methods to determine whether a fee request is reasonable: (1) percentage of the fund or (2) lodestar. *American Art China, Co. v. Foxfire Printing & Packaging, Inc.*, 743 F.3d 243, 247 (7th Cir. 2014). "One common method of choosing between the percentage and lodestar approaches is to look to the calculation method most commonly used in the marketplace at the time such a negotiation would have occurred." *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 500-01 (N.D. Ill. 2015) (citing *Cook v. Niedert*, 142 F.3d 1004, 1013 (7th Cir. 1998)). The favored approach in the Northern District of Illinois "is to compute attorney's fees as a percentage of the benefit conferred upon the class." *In re Ky. Grilled Chicken Coupon Mktg. & Sales Practices Litig.*, Case No. 09-cv-7670, 2011 U.S. Dist. LEXIS 157910, *9 (N.D. Ill. Nov. 30, 2011); *see also, e.g.*, *In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.*, 80 F. Supp. 3d 838, 844 (N.D. Ill. 2015) (noting that the percentage of fund method is the preferred method in the Northern District of Illinois).

With respect to TCPA cases specifically, courts in the Northern District of Illinois overwhelmingly – if not exclusively – award fees using a percentage of the fund method. *See, e.g.*,

5

*In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 795 (N.D. Ill. 2015) (finding that a percentage of fund is "more likely to yield an accurate approximation of the market rate" in a TCPA case, and that "had an arm's length negotiation been feasible, the court believes that the class would have negotiated a fee arrangement based on a percentage of the recovery, consistent with the normal practice in consumer class actions.") (Holderman, J.); *Craftwood Lumber Co. v. Interline Brands, Inc.*, Case No. 11-cv-4462, 2015 U.S. Dist. LEXIS 35421, *14 (N.D. Ill. Mar. 23, 2015) (percentage of the fund is the best approach for TCPA class actions because "given the opportunity … class members and Plaintiff's counsel would have bargained for" a similar arrangement) (St. Eve, J.); *Wright v. Nationstar Mortg. LLC*, Case No. 14-cv-10457, 2016 U.S. Dist. LEXIS 115729, *52-53 (N.D. Ill. Aug. 29, 2016) (Chang, J.) (finding the percentage-of-recovery method proper in TCPA class actions); *Ossola et al. v. American Express Company et al.*, Case No. 13-cv-4836, Dkt. 379 (N.D. Ill. Dec. 2, 2016) (Lee, J.) (granting class counsel's request for one-third of the total settlement fund); *Aranda v. Caribbean Cruise Line, Inc.*, Case No. 12-cv-4069, 2017 U.S. Dist. LEXIS 52645, *18 (N.D. Ill. Apr. 6, 2017) (Kennelly, J.); *Strache v. SCI Direct, Inc.*, Case No. 17-cv-4692, Dkt. 43 (N.D. Ill. March 14, 2018) (Lee, J.).

Accordingly, Class Counsel believes the percentage-of-fund method is the appropriate method to use in this case.

### B. Counsel's Request is Within the "Market Rate".

#### 1. The Market Rate for TCPA Class Action Settlements.

Courts should award fees to class counsel based on the "market rate", determined by "approximating the terms that would have been agreed to *ex ante*, had negotiations occurred." *Synthroid I.*, 264 F.3d at 719.

Multiple courts within this district have undertaken this "market rate" analysis in the TCPA

context and have found that the baseline rate in TCPA common fund cases is, relevantly, 30 percent of the first $10 million of recovery. The most frequently cited case on this topic is *In re Capital One*, 80 F. Supp. 3d at 795. There, in reliance on *Synthroid I* and *Synthroid II*,[1] Judge Holderman found that the baseline structure for fees in a TCPA class action should be 30 percent of the first $10 million, 25 percent of the next $10 million, 20 percent of $20-45 million, and 15 percent of the excess above $45 million. 80 F. Supp. 3d at 804-05. Judge Holderman justified the declining scale approach on the fact that, in the case before His Honor, "the measure of damages depends more on the number of class members (or phone calls) than the additional efforts of counsel." *Id.* at 804. Judge Holderman found similarly with respect to the risk premiums to be applied to the percentages. *Id.* at 806-07. In applying a six percent risk premium only to the first band of recovery (making it 36 percent of the first $10 million), Judge Holderman found that "all of the risk factors in this case were limited to the question of [defendant's] liability … and would not have affected Class Counsel's ability to achieve the additional damages recovery reflected in the second, third, and fourth tiers." *Id* at 807. The Court kept with the baseline numbers for the remaining tiers.

Numerous other courts have followed suit with respect to the baseline percentages and declining fee scale approach. *See, e.g.*, *Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 237 (N.D. Ill. 2016) (Feinerman, J.); *Craftwood Lumber Co. v. Interline Brands, Inc.*, 2015 U.S. Dist. LEXIS at *14 (St. Eve, J.); *Aranda*, 2017 U.S. Dist. LEXIS 52645 at *18 (Kennelly, J.) *Wright v. Nationstar Mortg. LLC*, 2016 U.S. Dist. LEXIS 115729 at *53-54 (Chang, J.).

### 2. The *Synthroid I* Factors Support the Requested Fee and Risk Adjustment.

There thus seems to be little controversy on the baseline rates for the average TCPA case.

---

[1] *In re Synthroid Mktg. Litig.*, 325 F.3d 974 (7th Cir. 2003). In *Synthroid II*, the Court awarded class counsel 30 percent of the first $10 million.

*See, e.g.*, *Wilkins v. HSBC Bank Nev., N.A.*, Case No. 14-cv-190, 2015 U.S. Dist. LEXIS 23869, *39-40 (N.D. Ill. Feb. 27, 2015) (awarding the baseline fee percentages in an "average" TCPA case); *In re Capital One*, 80 F. Supp. 3d at 806-07 (awarding a six percent risk premium on the first $10 million because establishing liability was "slightly riskier" than in a typical TCPA class action). As the settlement here was for $2.9 million, only the first band is relevant, and the baseline amount would be 30 percent of that $2.9 million, or $870,000.

For the reasons set forth in more detail below, however, Class Counsel believes this case was riskier, and the results better, than a typical TCPA class action, which justifies a commensurate upward risk adjustment to the baseline rates. *See* Glapion Decl., ¶¶ 5-9. Class Counsel's request of $966,666.67 is based on a three-point risk adjustment to the baseline percentage for the $2.9 million settlement (33 percent).

There is precedent for similar risk adjustments. As discussed, in *In re Capital One*, Judge Holderman applied a six percent risk adjustment to the first tier of recovery, finding that the case was slightly riskier than the average TCPA case. 80 F. Supp. 3d at 806. Judge Holderman limited this risk adjustment to the first tier because "all of the risk factors in this case were limited to the question of [defendant's] liability … and would not have affected Class Counsel's ability to achieve the additional damages recovery reflected in the second, third, and fourth tiers." *Id* at 807.

In *Aranda v. Caribbean Cruise Line, Inc.*, however, Judge Kennelly awarded a six-point risk premium on the first band, a five-point risk premium on the second band, a four-point premium on the third band, and a three-point premium on the fourth band (36%, 30%, 24%, and 18%, respectively). 2017 U.S. Dist. LEXIS 52645 at *29. In so doing, Judge Kennelly made several findings. First, *Capital One* and other cases declining to award a risk premium on multiple bands (or at all) "settled at an early stage, prior even to a contested class certification motion." *Id.* at *27.

8

Second, the fact that "defendants offered significant value" only in the late stages indicates "that defendants believed their prospects for escaping liability without settling were good." *Id.* at *23-24. Third, despite nearly 50 million calls, only five TCPA suits were filed against the *Aranda* defendant, which "suggests that most members of the [plaintiffs'] bar saw this litigation as too risky for their practices." *Id.* at *8 (citing *Silverman*, 739 F.3d at 958). In a hypothetical *ex ante* negotiation, this placed plaintiffs' counsel in position to bargain for a favorable fee structure. *Id.* at *17. Ultimately, Judge Kennelly summed up his decision to award a risk premium at each band as follows:

> In such a[n *ex ante*] negotiation, for example, plaintiffs and their potential attorneys might consider that at each successive, successful stage of the litigation (for example, the denial of a motion to dismiss stage to certification of a class to the denial of summary judgment), the size of the expected payout increases as defendants' bargaining power decreases. A defendant may, for example, be unwilling to settle for any amount initially because it believes the case will be dismissed, and following the denial of a motion to dismiss, the defendant may be willing to pay $10 million, but not more, because it still believes the class is unlikely to be certified. The defendant would be likely to offer more following class certification, and plaintiffs' counsel could reasonably expect to be awarded a considerable portion of that increased fund, which only became available following counsel's work to certify the class. …

*Id.* at *27-29.

Though there is only one "band" at issue here, this logic is nonetheless directly applicable to the instant case. Here, there were no class-wide settlement discussions until after Plaintiff defeated Defendant's Motion to Dismiss, the parties completed discovery, and Plaintiff filed her Motion for Class Certification. The Parties did not agree on a settlement until after Plaintiff prevailed on her contested Motion for Class Certification. Class Counsel's efforts and success on these Motions both made a favorable settlement possible and necessarily increased its size.

A direct analysis of the *Synthroid I* factors further supports Class Counsel's position.

9

*Synthroid I* found that the market rate depends on "in part the risk of nonpayment a firm agrees to bear, in part on the quality of its performance, in part on the amount of work necessary to resolve the litigation, and in part on the stakes of the case." *Synthroid I*, 264 F.3d at 721. These factors support the proposed upward risk adjustment.

a.    Risk of Nonpayment

There was a genuine risk of non-payment in this litigation. At the outset of the case, Defendant appeared to be a relatively young and small company. Concerns about Defendant's ability to pay colored the early stages of this case and remained throughout most of the litigation. Glapion Decl., ¶ 6. In late May 2017, however, Defendant raised $500 million in financing at a $5 billion valuation.[2] While this briefly put to rest any concerns about Defendant's finances, this did not last. Less than six months after Defendant's successful financing round, it was sued by some of its investors for alleged fraud in securing the aforementioned investment.[3] These allegations appeared to Class Counsel to put at risk both the investment and, potentially, the company itself. Accordingly, with the exception of that brief respite, concerns about Defendant's ability to pay existed throughout the case. Indeed, these concerns are reflected in the terms of the Settlement Agreement, which required Defendant to fully fund the settlement shortly after preliminary approval.

In addition, the risk of nonpayment is not just about the finances of a defendant, but also includes "the probability of success at the outset of the litigation[.]" *Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 565 (7th Cir. 1994). Whether Plaintiff could succeed on the merits of this case remained in doubt throughout. At the beginning, it was unclear whether and how the case would

---

[2] http://www.chicagotribune.com/bluesky/originals/ct-bsi-outcome-health-funding-500-million-20170531-story.html

[3] http://www.chicagotribune.com/business/ct-biz-investors-sue-outcome-health-20171107-story.html

be able to proceed given the then-pending *Spokeo* decision. This issue was significant enough that

it warranted a stay in the case until the Supreme Court issued its ruling, and the ultimate decision

resulted in Defendant's Motion to Dismiss. Liability was also not a slam dunk – Defendant argued

throughout litigation that its text messages were sent as the result of a technical glitch, and it even

petitioned the FCC for an exemption on those grounds. This petition was serious enough that it

drew the attention of organizations unaffiliated with this case, including the National Consumer

Law Center, who, along with Class Counsel, met with the FCC regarding this petition. Glapion

Decl., ¶ 7. Had a ruling gone in Defendant's favor, it could have effectively ended this litigation.

b. Class Counsel's Performance.

Class Counsel's performance is shown in the results obtained in the Settlement, as well as

the victories achieved along the way that made the Settlement possible. The Settlement provides

relief on a per-text-message basis, which will in turn result in one of the largest per Class Member

settlements in TCPA history. Amounts for some Class Members may reach well into the four or

five figures, and a Class Member with the median number of texts would see north of $1,000 with

even an exceptionally high claims rate of 63% of text messages claimed. This Settlement would

not have been possible without Class Counsel's successful opposition to Defendant's Motion to

Dismiss and successful Motion for Class Certification. Prior to the decision on Plaintiff's Motion

for Class Certification, the Parties tried, but failed, to reach a mediated resolution.

c. Amount of Work Necessary to Resolve the Litigation.

This case was not one that settled early or prior to discovery or dispositive motions. *See*

*Craftwood Lumber Co.*, 2015 U.S. Dist. LEXIS 35421 at *13 (noting that the fact the case settled

before contested class certification briefing, summary judgment, or trial cuts against the "amount

of work" factor). Instead, it did not and would not have settled without Plaintiff's success on the

11

Motion for Class Certification. For all intents and purposes, this Motion for Class Certification was a dispositive motion, and the settlement ultimately came about as a result of the Court's decision in Plaintiff's favor.

Success on this Motion would not have been possible without the extensive and thorough discovery conducted. Plaintiff served three sets of requests for production, two sets of requests for admission, and two sets of interrogatories. While the documents themselves were not voluminous, amounting to several hundred pages, they were often complex. For example, Class Counsel, who has no coding experience, was required to review the source code for Defendant's in-house text messaging application, which necessitated learning the basics of this source code language. Class Counsel also took four depositions, including two of Defendant's 30(b)(6) witnesses, one of Defendant's former employee (which relied heavily on the aforementioned source code), and one of Defendant's text messaging provider. Class Counsel retained an expert witness who evaluated Defendant's text messaging system and wrote a thorough report on its capabilities. Glapion Decl., ¶ 3. Finally, Class Counsel traveled to Washington, D.C. for a meeting with the FCC in response to Defendant's petition for an exemption from liability that would have directly impacted this case. *Id.* ¶ 7.

### 3. Class Counsel's Proposed Risk Adjustment is Reasonable.

Considering the above, Class Counsel believes that the request for a three percent upward risk adjustment to the baseline percentage is warranted. This case is similar to *Aranda* in that 1) the Settlement came about late in the litigation, after the conclusion of extensive discovery, and after a class had been certified; and 2) despite more than 120,000 unwanted texts and two years of litigation, no one else sued Defendant about its calling practices, suggesting the plaintiffs' bar's lack of interest.

12

The three-point risk adjustment – which smaller than that in *Aranda* – is meant to reflect the above factors and risks. Accordingly, Class Counsel requests 33 percent of the $2.9 million settlement for a total of $966,666.67.

### 4. The Requested Fee is in Line with Other TCPA Settlements.

The requested fee (which amounts to one-third of the total Settlement fund, or 35.25 percent after deducting estimated administrative costs, requested costs, and service award) is in line with other TCPA settlements in this district. The following chart shows several recent TCPA settlements and how the approved fee requests compares to the fee request made here:

| Case | Judge | Percentage Award | Percentage Award (After est. costs and service awards) |
|---|---|---|---|
| *Griffith v. ContextMedia* 16-cv-2900 (***proposed award***) | Judge Bucklo | 33.33% | 35.32% |
| *Vergara v. Uber Techs., Inc.* 15-cv-6942 (2018) | Judge Durkin | 36% (first $10m) | -- |
| *Desai v. ADT* 11-cv-01925 | Judge Bucklo | 33.33% | -- |
| *Ossola v. American Express* 13-cv-4836 (2016) | Judge Lee | 33.33% | 35.53% |
| *In re Capital One* 80 F. Supp. 3d 781 (2015) | Judge Holderman | 32.3% (first $15m) | -- |
| *Martin v. JTH Tax* 13-cv-6923 (2015) | Judge Shah | 33.33% | 38% |
| *Kolinek v. Walgreen Co.* 311 F.R.D. 483 (2015) | Judge Kennelly | -- | 36 % |
| *Aranda v. Caribbean Cruise* 2017 U.S. Dist. LEXIS 52645 | Judge Kennelly | 34% (first $15m) | -- |
| *Allen v. Chase* 13-cv-8285 (2015) | Judge Pallmeyer | -- | 33% |

In *Synthroid II*, in which the Seventh Circuit first discussed the sliding scale approach, the court noted that in some instances, there may be a hypothetical *ex ante* negotiation that led to, for example, "35% of the first $20 million[.]" 325 F.3d at 978. In another recent case, the Seventh Circuit wrote that fees in a consumer class action case should not "exceed a third or at most a half

of the total amount of money going to class members and their counsel." *Pearson v. NBTY, Inc.*,

772 F.3d 778, 782 (7th Cir. 2014). Class Counsel's request meets these guidelines.

### 5. The Requested Fee is in Line with the Representation Agreement.

In making a fee determination, Courts often consider "actual fee contracts that were

negotiated for private litigation." *Taubenfeld v. AON Corp.*, 415 F.3d 597, 599 (7th Cir. 2005).

However, such agreements are of little value to determining the market rate in a case such as this

because the named plaintiffs are less sophisticated buyers of legal services than may be the case

in non-consumer contexts. *In re Capital One*, 80 F. Supp. 3d at 796. In any event, in the Seventh

Circuit, the typical contingency range is between 33 percent and 40 percent. *See, e.g.*, *Gaskill v.

Gordon*, 160 F.3d 361, 362-63 (7th Cir. 1998); *Kirchoff v. Flynn*, 786 F.2d 320, 323 (7th Cir.

1986). Class Counsel's contract with Plaintiff calls for a one-third contingency fee. Glapion Decl.,

¶ 17.

### C. Class Counsel's Costs are Reasonable.

Class Counsel requests $68,910.73 in costs related to this litigation. $58,910.73 has been

expended to date, and the remaining $10,000 has not yet been paid out of pocket but is contingently

owed to Cingular/AT&T upon Court approval. In response to Plaintiff's subpoena for class

member information as part of providing notice, AT&T sent Class Counsel an invoice for $20,000.

Plaintiff's counsel, concerned about this cost compared to the cost another telephone carrier

charged (approximately $6,000) for responding to an even larger (in terms of class telephone

numbers) but otherwise identical subpoena, declined to pay $20,000. After discussion, Class

Counsel agreed to pay $10,000 up front, and the additional $10,000 if approved by the Court.

As for the $58,910.73 already expended, these costs are reasonable for a litigation of this

size. Of the expenses paid to date, the largest categories have been the costs of subpoenas for class

14

member information ($15,797), expert witness fees ($11,231.25), and mediation fees ($8,509.38). This is nearly 60% of the total expenses to date. The remaining costs are primarily deposition and transcript fees and travel costs. The expended travel costs were reasonable – they consisted of coach or business class flights and standard hotel rooms at standard rates, and standard meals at typical local restaurants in the area. Glapion Decl., ¶¶ 10-14.

### D.  The Service Award to Plaintiff Should Be Approved.

Class Counsel also requests that the Court finally approve a service award of $10,000 to Plaintiff Griffith. Such awards are routinely awarded in TCPA actions, and consumer class actions generally. "When determining whether and how much to award as an incentive for a named plaintiff, courts are instructed to consider actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Kolinek v. Walgreen Co.*, 311 F.R.D. at 503 (citing *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998)).

The requested award is warranted here. Plaintiff Griffith has been on board with the case since the beginning. Plaintiff Griffith initiated the case and stayed heavily involved and up-to-date throughout. She timely responded to Defendant's discovery requests and sat for a lengthy and difficult deposition in Illinois. She was easy to reach by Class Counsel and quick to respond to any request, demand, and/or update made to her regarding the case. Plaintiff Griffith was genuinely an asset to the case, beyond her role as lead Plaintiff. Glapion Decl., ¶¶ 15-16, 18.

## IV.  CONCLUSION

Class Counsel respectfully requests that the Court award $966,666.67 in fees and $68,910.73 in costs, for a total of $1,035,577.40. Class Counsel further requests that the Court provide a service award to Plaintiff Griffith in the amount of $10,000.

Dated: July 13, 2018

/s/ Jeremy M. Glapion
Jeremy M. Glapion
**THE GLAPION LAW FIRM, LLC**
1704 Maxwell Drive
Wall, New Jersey 07719
Tel: 732.455.9737
Fax: 732.709.5150
jmg@glapionlaw.com

Kristen Law Sagafi
**TYCKO & ZAVAREEI LLP**
483 Ninth Street, Suite 200
Oakland, CA 94607
Tel: 510.254.6808
Fax: 202.973.0950
ksagafi@tzlegal.com

Andrew Silver
**TYCKO & ZAVAREEI LLP**
1828 L Street NW, Suite 1000
Washington, DC 20036
Tel: 202.973.0900
Fax: 202.973.0950
asilver@tzlegal.com

16