# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **CHRISTY GRIFFITH**, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>v.<br><br>**CONTEXTMEDIA HEALTH, LLC d/b/a OUTCOME HEALTH**<br><br>Defendant. | Case No.: 1:16-cv-02900<br><br>Honorable Elaine E. Bucklo |

**Declaration of Jeremy M. Glapion In Support of Plaintiff's Motion for Attorneys' Fees, Costs, and Service Award**

I, Jeremy M. Glapion, declare as follows:

1.  I am the founder of Glapion Law Firm and a member in good standing of the State Bars of New Jersey and New York. I am admitted to practice in the United States District Court for the Northern District of Illinois. I make this declaration based on my own personal knowledge. If called upon to testify, I could and would testify competently to the truth of the matters stated herein.

2.  I accepted this case expecting that the case would be risky and hard-fought, given its potential size and scope.

3.  Indeed, from the outset, the litigation was difficult and contentious, and required extensive discovery and difficult motion practice. With respect to the discovery, Plaintiff served three sets of requests for production, two sets of interrogatories, and two sets of requests for admission. While Defendant's document production itself was not voluminous, I was required to review the source code for Defendant's in-house text messaging application, which necessitated learning the basics of this source code language. Class Counsel retained an expert witness who evaluated Defendant's text messaging system and wrote a thorough report on its capabilities. Plaintiff also took four depositions – two of the depositions were of Defendant's 30(b)(6) witnesses, one was of Defendant's former employee, and one was of Defendant's text messaging service provider. The 30(b)(6) depositions in particular were lengthy, difficult, and often contentious. Defendant, for its part, not only served discovery requests on Plaintiff Griffith, but took Plaintiff Griffith's deposition in Illinois (which necessitated travel from her home in North Carolina).

4. With respect to motion practice, Defendant moved to dismiss Plaintiff's claims, and Plaintiff moved for class certification. A decision adverse to Plaintiff on either of these motions would have effectively ended the litigation.

5. While Plaintiff prevailed on those motions, and I remain confident in the strength of the claims, there were other serious risks to the case even after those motions were decided.

6. First, throughout this case, there were real questions in my mind about Defendant's viability and ability to pay.

7. Second, there was a real chance of a change in the law given the current climate and Defendant's petition with the FCC for an exemption from messages sent as a result of a technical glitch, which it claimed to be the case here. For purposes of this case, I traveled to Washington, D.C. to meet with the FCC, along with the National Consumer Law Center, regarding this petition.

8. Third, there remained outstanding and difficult issues on the nature of Defendant's system and whether it qualified as an automatic telephone dialing system, which has only been made more uncertain recently.

9. Had Plaintiff lost this case, neither I nor my fellow Class Counsel would have received fees or cost reimbursement, as our representation agreement Plaintiff Griffith limit our recovery to a one-third contingency fee plus costs, all to be paid from any recovery.

10. Fellow Class Counsel and I have spent $58,910.73 litigating this matter. The largest categories have been the costs of subpoenas for class member information ($15,797), expert witness fees ($11,231.25), and mediation fees ($8,509.38). The bulk of the remaining costs are deposition and travel costs.

11. The travel costs reflect economy or business class airfare, standard hotel rooms, cost of traveling to and from the airports, transportation while traveling, and meal costs. By way of example, I was scheduled to take three depositions in five days in Chicago in July 2017. Roundtrip business class flight costs were $941.96, hotel costs were $1,199.75, local travel expenses (taxis) were $107.59, and meal costs (2-3 meals per day) were $322.15.

12. An additional $10,000 is owed to Cingular should the Court approve this additional $10,000 expense. This amount is the result of an agreement between Cingular and Class Counsel.

13. In response to Plaintiff's subpoena for class member information as part of providing notice, AT&T sent Class Counsel an invoice for $20,000. Class Counsel, concerned about this cost compared to the cost another telephone carrier charged (approximately $6,000) for responding to an even larger (in terms of class telephone numbers) but otherwise identical subpoena, declined to pay $20,000. After discussion, Class Counsel agreed to pay $10,000 up front, and the additional $10,000 if approved by the Court.

14. This $10,000 would be on top of the $58,910.73 already spent, for a total of $68,910.73.

15. Plaintiff Griffith has spent a considerable amount of time and effort seeing this case through to its conclusion.

16. Plaintiff Griffith has been on board with the case since the beginning. Plaintiff Griffith also timely responded to Defendant's discovery requests and sat for a lengthy and difficult deposition that required travel from North Carolina to Chicago. She remained attentive and involved throughout the litigation, to an extent that Class Counsel finds rare.

17. The retention agreement between myself and Plaintiff Griffith calls for a one-third contingent fee.

18. Ultimately, despite the risks mentioned above and in the supporting memorandum, the parties reached a settlement that provides exceptional relief to class members, due, at least in part, to Class Counsel's zealous advocacy, preparation, discovery, motion practice, and negotiation, as well as the continued and constant involvement of the lead Plaintiff.

I declare under penalty of perjury under the laws of the State of Illinois that the foregoing is true and correct.

Executed on this 13th of July, 2018, at Wall, NJ.

*/s/ Jeremy M. Glapion*_____
Jeremy M. Glapion